A92A1749. TAYLOR v. TAYLOR.
(430 SE2d 659)

BIRDSONG, Presiding Judge.
The appeal is dismissed as improvidently granted.

*Appeal dismissed. Pope, C. J., Andrews, Johnson and Black-burn, JJ., concur. McMurray, P. J., Beasley, P. J., and Cooper, J., dissent.*

BEASLEY, Presiding Judge, dissenting.

I respectfully dissent from the dismissal of this appeal as improvidently granted.

The issue in this appeal is whether the trial court erred in changing custody of the parties' children from appellant Melanie Taylor to appellee Robert Taylor, either by applying the incorrect legal standard or because there is no evidence of a material change of circumstances so as to support the verdict.

The trial court found: "Mr. Taylor has remarried and lives with his new wife and stepdaughter. Ms. Melanie Taylor recently gave birth to a child out of wedlock whose father left her before the child's birth. Based upon the evidence adduced at the hearing, the lifestyle of the mother is such that the court believes it is not in the best interests of the children of the parties to be raised in her home. Generally, the court believes the children will fare better in the long run when raised in a conventional home where they have the example of a mother and father as role models. As these children become adolescents in this changing world, they will need the guidance of dedicated parents, present in the home and able to set the proper example for the children to follow. Because of the special nature of the home of this mother (defendant) the children would not have an opportunity to grow and develop in traditional surroundings. Conceding that the mother loves the children as much as the father [does], it does not follow that her home would naturally present opportunities for normal growth and development."

The children are a girl, age 8, and a boy, age 12. The parties were divorced in January 1987, and custody was granted to the mother, Melanie Taylor. For several months or a year after the divorce, the father had little or no contact with his children. After the divorce Mr. Taylor was unemployed for a period of two years, during which he attended vocational school; at the time of the hearing, he had been employed for six months. His gross income is $11,000 per year. He has been married for three years and lives with his stepdaughter and present wife, who earns $36,000 per year.

Appellant, who is 31, bore a child out of wedlock in September 1991. This baby's father is 50 and is unmarried; he is the president of a Mercedes-Benz dealership. Appellant began dating him in March 1989; she dated him continuously and exclusively until their child was born in September 1991; she has dated no one else since that time. They planned to marry and looked for a house but he did not marry her; he has not said he will never marry her but that he will not

marry her at this time; she is in love with this man, plans to continue to see him and to have sexual intercourse with him. The baby's father pays about $100 per week child support and continues to visit appellant's home. She testified that he usually visits when the parties' children are with their father or after the children have gone to bed; that they have never seen her in bed with the baby's father although she has never locked them in their rooms. There is no evidence to the contrary.

At the time of the divorce, the children's mother was a licensed practical nurse working at Phoebe Putney Hospital in Albany, earning $7 per hour. Having determined she did not earn enough to support her children as she desired, she attended school to become a registered nurse (RN), from 1988 until 1990. She attended school 20 hours per week, studied two or three hours per day and worked full time and overtime. She was unable to afford child care expenses, and asked her father and stepmother to look after the girl as they lived nearer her school. Her mother and stepfather looked after the boy. Ms. Taylor's father testified that during the one-and-one-half years he kept the girl, appellant Melanie Taylor visited her daughter at his house frequently but Mr. Taylor visited less frequently.

Although he remarried in April 1988, at about the time his children began living with their maternal grandparents, and although he was unemployed most of that time and stayed at home looking after his present wife's daughter, there is no evidence that appellee made any effort to look after his own children while their mother attended school.

After she finished school, appellant immediately brought the children home to a four-bedroom house. She continues to work at Phoebe Putney Hospital as an RN in the neonatal intensive care unit. She now earns $12 per hour, or $27,000 in 1990.

Mr. Taylor sued Melanie Taylor for custody of the children because she gave birth to a child out of wedlock in September 1991, and because she continues to have a sexual relationship with the father of the baby while knowing he will not marry her. Mr. Taylor testified that in his opinion, "every divorced woman who sleeps with a man to whom she is not married should lose custody of her children." He and his present wife are very faithful church members. He believes his children are being raised in an atmosphere of immorality; that their mother's having a child out of wedlock will cause the boy to "grow up to be a child abuser," and "is teaching my little girl that it is okay to have a [sexual] relationship outside of [marriage]" and that she herself will one day be "permissive."

There is no evidence of child abuse. Dr. Wagner, the psychologist retained by the father, did not testify. The portions of his report in evidence show that he found both children to be emotionally dis-

turbed, but he concluded their best interest would be served by remaining with their mother; that the girl "has had no problems whatever"; and that he could not recommend her custody be placed in her father; and that she would be "very angry and very disturbed if she cannot continue to live with her [mother]."

Dr. Carden, the psychologist retained by appellant, is a specialist in child psychology. Dr. Carden testified he performed extensive interviews and psychological tests on both children; both perform in school above their expected level, have a good environment in their mother's home, are well-adjusted, very well-mannered, and have many friends who visit in their home. He found that neither child was emotionally insecure because appellant had a child out of wedlock; their reaction to the new baby is "typical and normal." As to "what [he thinks will] happen to [these children]" as the result of their mother's having a child out of wedlock, Dr. Carden said, "It is not so much what happens to a child; it is how it is dealt with. And provided that the mother uses that as a learning opportunity, provided that she instructs the children in proper moral development . . . to help children understand that we all make mistakes, I don't think that it will have one detriment to the child whatsoever. . . . It can be used as a very positive learning experience. . . . I think that it will have a positive bearing on [these children's] outlook. I think that [appellant] is capable of doing that instruction in a way that will allow them to learn from the fact that we all make mistakes; we are all human." He found that the boy's anxiety concerned the custody dispute; that the children would rather not live with their father; that a drastic move would not be in the boy's interest as he needs stability; that the best interests of the children would be to remain with their mother.

Mr. Taylor relies on a letter written by the boy saying: "My life stinks. My parents are divorced. I live with my mom. My mom's boyfriend got my mom pregnant. Then he dumped her. I don't mean to curse but he's a total ass. Sorry." However, the letter continues: "My dad is well . . . I don't know. He doesn't work. I've got a bratty stepsister. She's spoiled and even has a water bed. All I have is a bed to sleep in. And my dad treats me mean. At my mom's I get treated like a human being and I have a Nintendo."

The children's sixth and second grade teachers testified that the children are A and B students and their conduct is very good; they get along well with other children and are normal, outgoing, very responsive, eager to learn, neat and well-mannered. The boy is an "All-American little boy" who is "a delightful student." The girl is "well-adjusted" and "self-assured"; "she feels good about herself and has a good sense of who she is"; she made straight A's during the school year starting September 1991 (when her half-brother was born); her behavior "[n]ever fell below . . . satisfactory."

Ms. Taylor's father, Mr. Eunice, testified that he and his wife kept the girl for one-and-one-half years while his daughter attended school. In his opinion the children would be better off living with their father "because of the immorality that they are exposed to currently . . . and [their] neglect," caused by their having to spend a lot of time with "friends, relatives and babysitters" because "part of the time [their mother] is at work, but . . . other times . . . she has to go out and party." As to where his daughter "parties," he believes she goes to nightclubs but he "can't witness this for sure," because he personally has never seen her partying. He believes custody should be removed from his daughter, not because she gave birth to another child out of wedlock but because he does not approve of her lifestyle. He once saw a bottle of wine in her refrigerator, which he does not think is appropriate "because it can lead to other things." He does not understand her present ill-feelings toward him, but he believes this is on account of his friendship with his former son-in-law. Mr. and Mrs. Eunice visit the children whenever the children are at Mr. Taylor's house. Mrs. Eunice testified in effect that she performed the role of a mother while the girl lived with them; she picked the child up at school and went on field trips.

Ms. Taylor testified she was in love with the baby's father and hopes to marry him. Between January 1990, and November 1991, she went to a nightclub only twice. She drinks "occasionally," and last enjoyed a drink with the baby's father in her home "sometime around Christmas." A close friend and co-worker of appellant testified that she visits often in appellant's home and has taken trips with her and her children. The friend testified that in the three years she and appellant had been friends, the baby's father was the only man appellant dated; "at one time there was a wedding planned, hopefully." The friend testified the older children love the baby and that the boy "is usually a little bit more off in his room, but since the baby has been born, he would come out a lot and be affectionate." This friend had never seen Ms. Taylor drink alcohol that she could remember.

We have held repeatedly that a change in custody of a minor child is authorized only where there has been a material change in circumstances. OCGA § 19-9-1 (b). "The award of custody of a child of the parties in a divorce decree is conclusive unless there have been subsequently to the decree new and material changes in the conditions and circumstances *substantially affecting the interest and welfare of the child.* [Cits.]" (Emphasis supplied.) *Young v. Young,* 216 Ga. 521, 522 (118 SE2d 82). The trial judge is given discretion in determining whether a material change has occurred (id.; *Hayes v. Hayes,* 199 Ga. App. 132, 133 (404 SE2d 276)), but " 'he is restricted to the evidence and [the court is] unauthorized to change the custody where there is no evidence to show new and material conditions that

affect the welfare of the child.'" *Evans v. Stowe*, 181 Ga. App. 489, 491 (352 SE2d 811). The question is not whether there has been a change of conditions, but whether there has been a *material* change, i.e., one that affects the welfare of the child. That necessarily means the change of conditions must be one which is adverse or detrimental to the child's welfare.

The trial court did not follow the correct legal standard for determining custody in this case. Under the proper legal standard — whether there has been a change of condition materially (adversely) affecting the welfare of the child — there is no evidence to support its change of custody. There is no evidence that the mother's lifestyle has had an adverse or detrimental effect on the welfare of these children. In a 1980 case we held that the fact that the mother was living with a man who was not her husband may be sufficient under the any evidence rule to authorize a decision "that the child's welfare would be enhanced by a change of custody." *Bell v. Bell*, 154 Ga. App. 290, 292 (267 SE2d 894). But we more recently confirmed that the issue is not whether the child's welfare will be enhanced (improved) by a change of custody. Rather, the issue is whether there has been a material change, that is, a change which *adversely affects the child's welfare*. See *Arp v. Hammonds*, 200 Ga. App. 715, 718 (409 SE2d 275). This is a necessary conclusion, for all change materially affects a child's welfare; an adverse change may even have a favorable effect on a child's welfare. Since the object is the child's best interests, the only justification to change custody, based on a change in circumstance, is that the change has harmed the child's welfare.

"[A] showing of changed conditions of [a parent] without a showing of its material effect on the child, is insufficient to warrant a change in custody." *Robinson v. Ashmore*, 232 Ga. 498, 502 (207 SE2d 484); *Evans*, supra. "Material" change, in the sense of a child's best interests, means an *adverse* change. We recently declined to overturn a ruling leaving custody in a mother although the evidence showed she had lived with a boyfriend and the children had been in the bed with them while watching television. *Hayes*, supra. As in *Hayes*, the children in this case have never seen their mother in bed with their half-brother's father. Id. at 133.

The professional observers in this case agreed unanimously that the best interest of these children will be served by allowing them to remain with their mother. The undisputed and overwhelming evidence shows that, as Dr. Carden indicated, appellant has dealt with her special circumstance with her older children in a positive manner. The only element in this case indicating that appellant's changed circumstances have an adverse effect on these children was appellee's bald speculation that in the future the girl would be permissive and the boy would be a child abuser. Such fears and speculations are not

supported by the evidence, nor are they evidence of a present adverse effect. Appellee's opinion that his son "has a disrespect sometimes for women" is not supported by any evidence. Appellant's father's opinion that her children were exposed to "immorality" is a personal philosophical or judgmental opinion only, as to which the court is not an arbiter except in cases involving evidence of actual detrimental effect; his opinion that the children were suffering "neglect" is not supported by any evidence. Appellee's opinion that appellant is "indoctrinating" his kids by her lifestyle does not constitute evidence of a change adversely affecting the children. His opinion that "any woman that is divorced and has a sexual relationship with a man that she is not married to should lose custody of her children" is not one that we have adopted in Georgia courts. Even assuming appellant broke the moral code of some persons or of society at large, deprivation of child custody is not a sanction which a court may render. See the dissent in *Gibson v. Pierce*, 176 Ga. App. 287, 290 (335 SE2d 658). Although appellee stated that appellant arbitrarily changed the visitation schedule, "there was no evidence that [appellant] wilfully interfered with his visitation or maliciously moved the [children] . . . so that [appellee] could not see [them]." *Hayes,* supra at 133.

Finally, the trial court's finding that the baby's father "left [appellant] before the child's birth," is factually incorrect and not supported by any evidence.

The reasons given by the trial court for this change of custody have to do with its belief that children will fare better when raised in a "conventional" and "traditional" home where they have the example of a mother and father as role models, and that they must have an "opportunity to grow and develop in traditional surroundings." These are not preconditions to child custody which this state has recognized, and are not grounds to remove custody from a single parent. The trial court's ultimate conclusion that appellant's home is deficient because it does not provide the "dedicated guidance" of both a mother and a father as in a "traditional" or "conventional" home, and that consequently her home does not "present opportunities for normal growth and development," is not the standard for determining a change of custody and is, moreover, not supported by any evidence and is contrary to the overwhelming evidence in the case.

According to the cases cited above, I find no evidence of a material change in circumstances, that is, there is no evidence that appellant's changed circumstances have adversely affected her children's welfare so as to warrant or authorize a change in custody.

The judgment below should be reversed.

I am authorized to state that Presiding Judge McMurray and Judge Cooper join in this dissent.

DECIDED MARCH 19, 1993 —
RECONSIDERATION DENIED APRIL 2, 1993

*Vansant, Corriere & McClure, John M. Vansant, Jr., K. Alan Dasher,* for appellant.
*Black & Black, Eugene C. Black, Sr.,* for appellee.